Wallace *v.* Wallace.

62  509
r65  359
65  363

Hester Wallace

*v.*

William Wallace.

[Decided November 15th, 1901.  Filed December 21st, 1901.]

1. Where, in divorce, it appeared that there were some reasons which probably influenced the action of complainant in moving into the state other than a desire to acquire a divorce therein, but complainant and her mother both testified at their first examination that their object in coming

Wallace *v.* Wallace.

into the state was to enable the daughter to procure a divorce, and a year later, on re-examination, complainant stated that she was informed of the possibility of getting a divorce in the state by some notices she saw in the newspaper before the moving, and that she and her mother had talked of getting a divorce prior thereto, the evidence sufficiently showed that the principal reason for coming into the state was that a divorce might be acquired there.

2. Where a complainant in divorce has been deserted in another state, and moves into New Jersey for the purpose of securing a divorce in such state, she acquires no domicile, such as to give the courts of New Jersey jurisdiction where no service is had on the defendant within New Jersey.

On bill for divorce. Heard *ex parte* before a special master.

*Mr. Thomas S. Henry,* for the petitioner.

PITNEY, V. C.

The special master who heard and took the testimony in this cause has reported the same, and recommended that a decree of divorce be granted to the complainant.

The history of the cause is as follows: The bill was filed December 11th, 1899, a subpoena was issued and handed to the sheriff of Hudson county, and returned by him not served, with the usual affidavit that the defendant could not be found, but that he resided in the State of New York; and an order of publication was made January 17th, 1900, expiring March 17th, 1900.

By an affidavit made in the cause on May 14th, filed May 17th, 1900, it appeared that the defendant herein had sued the complainant herein in the supreme court of New York, and a trial had been had therein, but what was the nature of the suit did not appear, and that the defendant had been duly served in the State of New York with a notice of this suit, according to the statute and the practice of the court.

No appearance or answer having been filed, an order of reference was made on May 29th, 1900.

Depositions were taken before the special master on July 19th, 1900, and again, after a lapse of more than a year, on August 27th, 1901, those taken on the latter day being a re-examination of the complainant and one of the witnesses previously examined.

The facts elicited are the following: Complainant was born and lived continuously in New York City up to November, 1897. She lived with her parents, who were domiciled there, until she was married, in 1890, and afterwards with her husband, until he deserted her, in August, 1896. After the desertion she lived with her mother, then a widow, in the city of New York, until the fall of 1897, when both moved to New Jersey, and have ever since lived here.

Both mother and daughter, at their first examination, testified that their object in coming to New Jersey was to enable the daughter to procure a divorce from her husband. The language used by the mother, on her first examination, is as follows:

"I came to New Jersey to live with my children [she had a son] so that she could get rid of the bad rascal she had. My daughter and I support ourselves at work that comes from New York City—work on neckwear. My son is an actor, with a desk in a room on Fourteenth street. His regular voting place is New Jersey, when he is home. I consider myself a permanent resident of New Jersey."

And the daughter swears:

"I moved to New Jersey in order to get a divorce. That was my idea. I do not intend to move back to New York if I get it. I mean to live on with my mother in New Jersey."

When re-examined a year later complainant said that she was informed of the possibility of getting a divorce in New Jersey by some notices she saw in the newspapers, and that, before she moved to New Jersey with her mother, her getting a divorce was a subject of conversation between them. She did not talk about it with her uncles, who live in New Jersey.

There were other reasons which might well, and probably did, influence the action of the mother and the daughter in coming to New Jersey to live, which were given when they were recalled in August, 1901. But taking all the evidence, it is clear that the principal reason for their coming was the desire on the part of the daughter to procure a divorce; and it is not clear that they would have changed their residence except for the accomplishment of that purpose.

The desire to obtain a divorce was meritorious to a degree sufficient to excite the sympathy of the court. But it should always be borne in mind by the judge who deals with this class of cases *ex parte* that he naturally and necessarily hears but one side of the affair.

But sympathy for the complainant, however well exercised, should not induce the court to act if it lacks power for want of jurisdiction over the person of the defendant. The defendant has always, so far as appears, resided in the State of New York, and was served with a notice of this suit in that state. No service of any kind was made in this state.

In stating my reasons for being unable to agree with the conclusion of the learned master, I shall assume, as stated by Chief-Justice Beasley, in *Doughty* v. *Doughty, 1 Stew. Eq. 582,* that each state has complete power over the marriage relation of its citizens, and may dissolve it at its pleasure. Such power was exercised by the legislature of this state prior to the adoption of the constitution of 1844; and, however arbitrary and unjust the action of that body might be, its result was binding within its territorial jurisdiction; but beyond its limits it might be, and often was, of no binding force, and was not recognized by the courts of other jurisdictions.

It must, moreover, be admitted that many of the divorces granted by courts of one state, and binding upon all parties within the territorial limits of that state, are of no binding force beyond such territorial limits.

The principal cause of such invalidity is the want of jurisdiction over the person of the spouse proceeded against, by reason whereof the decree is not recognized as binding by the courts of other states, under that clause of the constitution of the United States which provides that "full faith and credit shall be given in each state to the  *  *  *  judicial proceedings of every other state."

In interpreting that clause the federal courts have always held that, in order to maintain the validity of a foreign judgment, it must appear that the court pronouncing it had jurisdiction of the person of the party proceeded against, as well as of the subject-matter, and that the adjudication of the court pronouncing

the decree that it had such jurisdiction is always open to question in another jurisdiction.

It follows, as a corollary to this thoroughly-established proposition, that no state can, by legislative enactment or otherwise, authoritatively determine what state of facts shall be sufficient to give the judgments and decrees of its courts validity in other states.

There must, of course, be jurisdiction over both the subject-matter and the person.

The question of jurisdiction over the subject-matter may be finally determined by the courts of the state exercising it, but the question of the jurisdiction of the person must be determined in accordance with the fundamental rules of justice, as interpreted by international law, and that, in this country, under our system, is a federal question, to be finally determined by the supreme court of the United States.

The courts of New Jersey have always interpreted the statute conferring jurisdiction of the subject of divorce upon this court, and regulating its proceedings thereunder, as requiring the court to so conduct suits against non-residents as that its decree shall, when set up in the court of a foreign jurisdiction, not only command the respect of that court, because manifestly obtained after a due observance of the fundamental maxims of justice, but also shall compel obedience and acquiescence under the federal constitution.

I feel quite sure that no judge of this court has ever consciously granted a divorce that he thought would be open to successful attack in a foreign jurisdiction for want of jurisdiction of the party decreed against. I deem the policy of the legislation on the subject decidedly against granting a divorce which shall be valid in this state, but invalid in another state. In this view I am supported by what was said in the opinion of the court of errors and appeals, in the case of *Felt* v. *Felt, 14 Dick. Ch. Rep. 606.*

The general, undoubted and unvarying principle of law and fundamental rule of justice is that a court cannot obtain jurisdiction of any person, *as a person,* without service of process upon him within its territorial jurisdiction, and any judgment

Wallace v. Wallace.

or decree *in personam* based upon anything short of such a service or a voluntary appearance, is absolutely void.

There is only one apparent exception to this rule, and it is only apparent, and that is that when the subject-matter of the suit, or the *res*, lies within the jurisdiction of the court, it may act upon that "subject-matter" after giving an absent party claiming an interest therein such reasonable notice as is required by the fundamental rules of justice.

The "subject-matter" which thus attracts the attention of the court is, naturally, primarily confined to physical, tangible property, and of rights therein and choses in action located within the territorial jurisdiction.

To this familiar class of subjects has, by a process of rather artificial reasoning, been added the "marriage state." This has been done upon the idea that it constitutes a distinct "matter," and it is accorded a *situs* as an incident to the domicile of one or both of the spouses within the territorial jurisdiction. *Its foundation is a domicile, with residence.* This result has been reached with much difficulty, and not without strong protest. See the opinion of Chief-Justice Beasley, in *Doughty* v. *Doughty, 1 Stew. Eq. 581.* Some courts, including those of New York, have held, as suggested by the learned chief-justice, that a divorce decreed under such circumstances is valid in the jurisdiction making it, but invalid elsewhere.

The right of a court to take jurisdiction of a subject-matter within its territorial jurisdiction, by service of notice outside that jurisdiction upon the person interested therein has its foundation in the very necessity of the case, and in that necessity only.

A party claiming a right in a subject-matter cannot be prevented from asserting and enforcing that right by the absence from the territorial jurisdiction of the party claiming an interest against him; and the effect of the action of the court has, in all such cases, been confined to judgments affecting the subject-matter, and does not warrant any judgment or decree *in personam* against the absent party. *Lynde* v. *Lynde, 9 Dick. Ch. Rep. 473; S. C., 10 Dick. Ch. Rep. 591; Hervey* v. *Hervey, 11*

*Dick. Ch. Rep. 424; Elmendorf* v. *Elmendorf, 13 Dick. Ch. Rep.*
*115.*

This absolute inability to render a judgment or decree *in*
*personam* based upon extra-territorial service of notice has led
many jurists to doubt, as we have seen, and some to deny the
power to decree a divorce upon extra-territorial service.

But it has been finally determined in a great majority of
jurisdictions, including the supreme court of the United States
as the final arbiter, that such a decree may be made which will
have extra-territorial force. *Atherton* v. *Atherton, 181 U. S. 155.*

The foundation of the jurisdiction in such cases, as I have
said, is found in the domicile of the complaining spouse within
the jurisdiction.

Unless jurisdiction exists in such case the spouse who has
good ground for divorce may lose his or her remedy by the mere
ability of the delinquent spouse to escape out of the jurisdiction
before service made; hence, the "necessity" above mentioned.

It is to be observed that the supreme court of the United
States, in the recent batch of cases involving this question, con-
fined its opinion, upon the precise point now under consideration,
to the case of a *matrimonial domicile*—that is, a case where the
domicile relied upon by the complaining spouse was the domicile
of both spouses while cohabiting as such. The cases are reported
in *181 U. S.* (between pages 151 and 187); and (at *p. 170*)
Mr. Justice Gray, after reciting the principal authorities on the
subject, says: "The authorities above cited show the wide diver-
sity of opinion existing upon this important subject, and admon-
ish us to confine our decision to the exact case before us. *This*
*case does not involve the validity of a divorce granted, on con-*
*structive service, by the court of a state in which only one of the*
*parties ever had a domicile; nor the question to what extent the*
*good faith of the domicile may be afterwards inquired into.*

"In this case the divorce in Kentucky was by the court of
the state which had always been the undoubted domicile of the
husband, and which was the only *matrimonial domicile of the*
*husband and wife.*

"The single question to be decided is the validity of that di-
vorce, granted after such notice had been given as was required by

the statutes of Kentucky. The husband always had his domicile in Kentucky, and the matrimonial domicile of the parties was in Kentucky. On December 28th, 1892, the husband filed his petition for a divorce in the court of appropriate jurisdiction in Kentucky, alleging an abandonment of him by the wife in Kentucky, and a continuance of that abandonment for a year, which was a cause of divorce by the laws of Kentucky. His petition truly stated, upon oath, as required by the statutes of Kentucky, that the wife might be found at Clinton, in the State of New York, and that at Clinton was the post-office nearest the place where she might be found." And (at *p. 172*): "We are of opinion that the undisputed facts show that such efforts were required by the statutes of Kentucky, and were actually made, to give the wife actual notice of the suit in Kentucky, as to make the decree of the court there, granting a divorce upon the ground that she had abandoned her husband, as binding on her as if she had been served with notice in Kentucky, or had voluntarily appeared in the suit. Binding her to that full extent, it established, beyond contradiction, that she had abandoned her husband, and precludes her from asserting that she left him on account of his cruel treatment. *To hold otherwise would make it difficult, if not impossible, for the husband to obtain a divorce for the cause alleged, if it actually existed.* The wife, not being within the State of Kentucky, if constructive notice, with all the precautions prescribed by the statutes of that state, were insufficient to bind her by a decree dissolving the bond of matrimony, the husband could only get a divorce by suing in the state in which she was found; and, by the very fact of suing her there, he would admit that she had acquired a separate domicile (which he denied), and would disprove his own ground of action, that she had abandoned him in Kentucky."

No difficulty arises in applying the principle previously stated, when the domicile relied upon is matrimonial; but when either of the spouses seeks to establish a domicile separate from the other, without the matrimonial quality, in a different jurisdiction, nice questions arise which have led to much contrariety of judicial decision. This question, as we have seen, is left undecided by the supreme court of the United States in the cases

just cited. But the carefully considered language of the court shows clearly enough that the true and only ground of jurisdiction in the class of cases in question is, as I have before remarked, "necessity." It further admonishes all courts to be very careful how they proceed in such cases upon anything short of a matrimonial domicile. See *Bell* v. *Bell, 181 U. S. 175.*

It is apparent at once that, conceding the right, doubtful at best, of either spouse, after separation, to abandon the matrimonial domicile and acquire a new and separate domicile in a different jurisdiction, and to found upon it the right to sue the other spouse by service of notice in a different jurisdiction, the character of the domicile so relied upon is of the utmost importance and should be inquired into with great care and severely criticised. The question is, is it really a domicile, or only a residence? And I cannot but think the motive in acquiring it is of the utmost importance in solving it.

And in this connection it is to be observed that the party acquiring a new and separate domicile voluntarily creates the very situation of "necessity" which, as we have seen, requires the court to exercise its exceptional, and, under the latest utterances of the supreme court of the United States, doubtful, powers to compel the other spouse to leave the matrimonial domicile and litigate in a foreign jurisdiction.

Take the present case: Desertion is a matrimonial offence in New York, for which a remedy is there given, not, however, of a divorce *a vinculo,* however long the desertion be continued. The complainant, after being deserted in New York, comes to New Jersey and resides here for two years and claims, and must establish, in order to succeed, that it was her husband's duty to follow her to New Jersey and live with and support her here, or, at the least, provide a home for and support her somewhere, and that his failure to do so amounts to desertion *here* in this jurisdiction, where desertion for that length of time of a resident of the state is a cause of absolute divorce, and then asks the court to compel her husband to come here to defend himself against that charge or go undefended, for, of course, the offence under our statute, upon which the complainant must rely, is not the desertion, however long the time, while complainant was a

resident of New York, but a continuation of that desertion for two years in the State of New Jersey.

It is thus seen that the complainant voluntarily creates the situation—the "necessity"—which enables her to make a matrimonial offence sufficient to entitle her to a divorce, which offence does not have that effect in the matrimonial domicile. Ought this court to assist a party to attain such a result, unless there is some controlling reason for acquiring the new domicile, other than the mere desire for an absolute divorce? I think not.

It is neither necessary nor proper to attempt to state here what influential circumstances will, in my judgment, suffice to legalize the acquisition of such new domicile. I will, however, mention one out of several which has heretofore influenced my judgment in that direction. It is this: a woman whose parents and relatives all live in New Jersey may marry a man living in New York and may become domiciled there with him; he may commit the matrimonial offence of desertion against her there and leave her in such circumstances that she has no home to go to except that of her parents or relatives in the State of New Jersey.

Great injustice has been done in many instances by a spouse acquiring an apparent, and in many cases simulated, domicile thousands of miles distant from his or her matrimonial domicile, and calling upon the other spouse who retains the matrimonial domicile to defend a suit for divorce all that distance from his or her residence.

Then it is so easy to impose upon and deceive the court in the matter of domicile, and so difficult to detect such imposition when the case is heard *ex parte*.

Spouses who seek to establish a distant domicile for the purpose of procuring a divorce, do not hesitate to swear, in the most positive manner, that they intend to remain and live permanently in the new domicile, and yet, as soon as their decree is granted they return to their former residence. All judges who have dealt with such cases have observed this phenomenon. I have myself read the evidence underlying the decree of a western court in several such cases, and in each, after swearing positively as just stated, the spouse returned at once to his

former home and occupation. No doubt the same phenomenon was present in the case of *Bell* v. *Bell,* above cited.

It may be that this question is of little practical importance in New Jersey in one aspect. There is but one state which, so far as I know, does not include continued desertion among causes for divorce, namely, New York, and comparatively little injustice can arise by compelling a party to come from New York to New Jersey to defend a divorce suit.

But in another aspect it is of great importance. If our courts assume to act upon a simulated domicile we cannot criticise other courts, however distant, for doing the same thing. We must observe the rule of comity, and do as we would be done by.

It has been my rule, and I believe that of the other members of the court, not to grant a decree for divorce for desertion based upon a service out of the jurisdiction and a domicile not matrimonial, unless such domicile has been acquired under circumstances showing sufficient and controlling reasons for its acquisition, other than the desire to procure a divorce, and certainly never when the avowed object was to obtain that relief.

Such was the *ratio decidendi* in *McGean* v. *McGean, 15 Dick. Ch. Rep. 21.* The court of errors and appeals, in affirming the decree in that case, does not disapprove of that ground, but saw fit to put its approval on another ground. *McGean* v. *McGean, 49 Atl. Rep. 1083.*

In *Tracy* v. *Tracy, 15 Dick. Ch. Rep. 25,* I made some of the suggestions hereinbefore stated, and declined to advise a decree, on two grounds—*first,* want of continued residence for two years, and *second,* because there was no sufficient proof of the *animus manendi.*

The court of errors and appeals, in reversing that decree (*Tracy* v. *Tracy, 48 Atl. Rep. 533*), held that the petitioner had acquired a *"residence"* for two years, and so brought herself within the statute of this state. But the learned judge who spoke for that court did not notice, or deal with, the question of the power of the court to acquire jurisdiction of the defendant, by service of notice upon him out of the state, based upon the residence there proven. I cannot believe that that aspect of the case was brought to their attention. The case of *Atherton*

v. *Atherton,* in the supreme court of the United States, had not then been published, and the learned judge, in his opinion in *Tracy* v. *Tracy,* omits to refer to some of the leading cases defining domicile, particularly *Harral* v. *Harral, 12 Stew. Eq. 279.*

And on that subject I beg leave to say that the words "inhabitant" and "resident," used in the first section of the statute, do not, naturally or necessarily, imply that the party, in order to be an "inhabitant" or a "resident," must have any established domicile in this state.

A person may reside in, and be a resident of, a place or state for years without acquiring a domicile.

The word "inhabitant" was used by Judge Paterson in drafting the act of 1794, which first gave jurisdiction to this court over the subject-matter of divorces; and the word "resident" was first introduced in the act of February 3d, 1818. *P. L. of 1818 p. 20.* It seems to be synonymous with "inhabitant." The object of the original act was, as I have said, to give this court jurisdiction of a new subject-matter, and not to define in what cases it should have power to proceed upon service of notice upon a non-resident out of the jurisdiction. (A careful study of the whole course of legislation shows this. The first legislation applied only to cases where both spouses were residents of this state.) And, if it had assumed to do so, its effort, as we have seen, would have been futile.

The legislature has the power to declare certain conduct to be a cause for divorce when committed against a resident spouse or inhabitant of the state who has no domicile here. And if such party brings suit here, *and is able to effect service upon the other party within the state,* the court will have complete jurisdiction of both the subject-matter and the party defendant, and may make a decree binding in all jurisdictions, without regard to the question of the real domicile of either of the parties. Such a case was *Pohlman* v. *Pohlman, 15 Dick. Ch. Rep. 28.*

Now, as before remarked, I think there is a clear distinction between a residence, of a nature sufficient to give the court jurisdiction of the subject-matter, under our statute, and also for the purpose of making a case of desertion as a cause of divorce, under the same statute, on the one hand, and the domicile which is

Wallace *v.* Wallace.

necessary to give this court jurisdiction, under international law, to decree a divorce based upon service of process or notice upon a non-resident out of its territorial jurisdiction, which decree shall stand the test of criticism by the supreme court of the United States. And I am unable to find in the opinion of the court of errors and appeals, in *Tracy* v. *Tracy,* evidence that the court had that distinction called to its attention, or that it intended to intimate an opinion upon it.

However, be that as it may, the opinion in *Tracy* v. *Tracy* carefully distinguishes that case from the *McGean Case,* and leaves the doctrine stated in the latter case in the opinion below undisturbed.

Then there is the great authority of Chancellor Green, as expressed in his opinion in *Brown* v. *Brown, 1 McCart. 78,* a case, for present purposes, like the present, although it does not appear by the report—whatever the record may disclose—that the jurisdiction there was found on extra-territorial service, or that the attention of the court was called to the question I have tried to discuss. After discussing the question of statutory jurisdiction of the cause, he says (at *p. 80*) : "Waiving all consideration of the question whether the wife can thus acquire a domicile distinct from that of her husband, whether she was not, in law, at the time of filing her bill, a resident of the State of New York, the actual residence in this state was adopted under circumstances which warrant the conclusion that the change of residence was made for the purpose of obtaining a divorce. Sound policy forbids that the judicial tribunals of this state should thus be used by citizens of other states, in evasion of their own laws, or to procure redress for which resort should be had to their own tribunals." It is true that his decree based upon that opinion was reversed upon appeal, but the opinion was not filed, and it may have been based upon a different view of the facts.

Chancellor Zabriskie does, indeed, say of *Brown* v. *Brown,* in *Coddington* v. *Coddington, 5 C. E. Gr. 265:* "It is well understood that the last case was reversed in the court of appeals on the ground that the chancellor held that, notwithstanding the act of 1857, a residence of five years during the desertion was still required; the complainant had resided in the state more

than three years during the desertion; and also because the chancellor held that a residence *resumed* in this state, seemingly for the purpose of bringing a suit, although there was an actual change of residence, was not sufficient under the requirements of the act."

I think that an examination of the evidence will show that the original domicile of complainant, before marriage, was in this state, and that after desertion by her husband in New York she naturally enough returned to her original domicile.

But, notwithstanding his reversal, we find the same great judge expressing himself to the same effect in incisive and graphic language in *Winship* v. *Winship, 1 C. E. Gr. 107* (at *p. 109*).

For these reasons I must decline to advise a decree for the complainant, and think that the bill should be dismissed.

It is proper to add that the learned master acted upon the erroneous supposition that the case of *McGean* v. *McGean* was reversed by the court of errors and appeals.

Since preparing the foregoing I have had the opportunity to read an opinion prepared by the chancellor in the case of *Sweeney* v. *Sweeney* (since reported, *50 Atl. Rep. 785*), which discusses from the standpoint of actual authority in New Jersey the questions which I have dealt with, and comes to the same conclusion, and I am authorized to say that he also agrees with my view of the duty and the power of the court to proceed in such a case upon service out of the jurisdiction.

I append the following digest of the statutes creating jurisdiction of the court of chancery over divorces:

. The original act, passed the 2d of December, 1794 (*Pat. L. of 1794 p. 143*), provides:

"that the court of chancery shall have jurisdiction of all causes of divorce by this act directed and allowed, *provided the parties be inhabitants of this* state."

There is no provision in it for acquiring jurisdiction of spouses out of the state, but it declares that the like process and course of practice and procedure shall be had and pursued in all causes of divorce as are usually had and pursued in other causes on the equity side of the said court, except, &c.

Wallace *v.* Wallace.

There was at that time no provision, so far as I am aware, for acquiring the jurisdiction or non-resident parties. I will refer to these provisions later.

On the 4th of March, 1795, the legislature passed a supplement to the Divorce act (*Pat. L. of 1795 p. 160*), providing:

"that in all divorce causes brought, or to be brought into the court of chancery of this state, if the party against whom complaint is or shall be made, hath or shall, *after the cause of complaint hath arisen,* remove without jurisdiction of the said court, so that the process thereof cannot be served or if served, the party cannot be compelled to appear and answer or plead, it shall and may be lawful for the chancellor, on bill filed and due *proof that the defendant hath removed as aforesaid,* to order a hearing on the facts charged in the said bill, and thereupon to pass a decree in the same manner as if the defendant had appeared and were present in court; provided, nevertheless, that a copy of said order for hearing be published in one of the public papers in this state, and in one of the public papers of the states of New York and Pennsylvania, or served on the party against whom complaint is or shall be made, for the space of two months at least before the day appointed for the said hearing."

These two acts show clearly enough that the legislature did not intend to give jurisdiction to the court of chancery over the subject of divorce except in those cases where the matrimonial residence at the time of the commission of the offence was in this state.

By the act of February 3d, 1818 (*Pat. L. of 1818 p. 20*), the legislature enlarged the jurisdiction by declaring that the court of chancery shall have jurisdiction:

"provided the parties [complainant and defendant] were or shall be inhabitants of this state [at the time of the injury, desertion or neglect complained of, or where the marriage shall have been solemnized or taken place within this state, and the complainant shall have been an actual resident in this state at the time of the injury, desertion or neglect complained of, and at the time of exhibiting the bill]."

It will be observed that the word "inhabitant" is retained in the first part of the act, and the words "actual residence" are inserted in the latter part, which is an amendment to the original act.

By the twelfth section the chancellor is authorized to proceed

Wallace *v.* Wallace.

against a non-resident by publication, and by the thirteenth section the previous acts were repealed.

This act was followed by the act of February 16th, 1820 (*P. L. of 1820 p. 43; Rev. L. of 1821 p. 667*).

That act repealed the three previous acts above mentioned, and by its first section defined the jurisdiction. By that act the jurisdiction was enlarged by adding to the text of the act of 1818, after the words "provided the parties, complainant and defendant," the words "or either of them," and by adding at the end of the first section of that act the words:

> "Or where the adultery was committed in this state, and the parties, complainant and defendant, or either of them, reside in this state at the time of exhibiting the bill; provided, such complainant shall make his or her oath or affirmation, to be annexed to the bill of complaint, that his or her complaint is not made by any collusion between him or her, and the defendant, for the purpose of dissolving their marriage, but in truth and good faith for the causes set forth in the bill of complaint."

That act makes no provision for proceeding against absent defendants, but reliance was had upon the provision of that section which said that the like process and course of practice should be had in divorce cases as in other cases in the court of chancery.

These were as follows:

The act of March 12th, 1798 (*Pat. L. of 1798 p. 303*), provides for the bringing in of non-resident defendants in foreclosure cases only.

The act of June 13th, 1799 (*Pat. L. of 1799 p. 428 § 16*) (at *p. 430*), provides for proceeding against non-resident defendants only in cases where there are several defendants and some of them reside out of the state and some within the state. It does not provide for a case where all the defendants or a single defendant reside out of the state.

The act of February 29th, 1820 (*P. L. of 1820 p. 99*), first provided for the bringing in, by publication, of any and all absent defendants in all causes. *Rev. L. of 1821 p. 702.*

By the act of December 13th, 1824 (*Harr. Com. 69*), the legislature provided that suit for divorce may be brought by petition and citation, as well as by bill.

Wallace *v.* Wallace.

The next legislation was an act passed on the 22d of February, 1843 (*P. L. of 1843 p. 84*), which recites doubts as to the construction of the act of 1820, and declares as follows:

"That the act to which this is a supplement shall be construed so as to give to the court of chancery jurisdiction of all causes of divorce, and of alimony or maintenance, in cases of desertion, by the said act directed and allowed; provided the complainant or defendant shall be a resident of this state at the time of the filing of the bill of complaint, and the complainant or defendant shall have been a resident of this state for the term of five years, during which such desertion shall have continued."

These sections were consolidated in the revision of 1846 (at *p. 922*), as follows:

"That the court of chancery shall have jurisdiction of all causes of divorce and of alimony or maintenance, by this bill directed and allowed, provided the parties, complainant and defendant, or either of them, were or shall be inhabitants of this state at the time of the injury, desertion or neglect complained, or where the marriage shall have been solemnized or taken place within this state, and the complainant shall have been an actual resident in this state at the time of the injury, desertion or neglect complained of, and at the time of exhibiting the bill, or where the adultery was committed in this state, and the parties complainant and defendant, or either of them, reside in this state at the time of exhibiting the bill, or where the complainant or defendant shall be a resident of this state at the time of filing the bill of complaint, and the complainant or defendant shall have been a resident of this state for the term of five years during which such desertion shall have continued; provided, such complainant shall make his or her oath or affirmation, to be annexed to the bill of complaint, that his or her complaint is not made by any collusion between him or her and the defendant, for the purpose of dissolving their marriage, but. in truth and good faith for the causes set forth in the bill of complaint."

By the act of March 20th, 1857, it was enacted

"that divorces from the bond of matrimony may be decreed for willful, continued and obstinate desertion for the term of three years [and] that all acts or parts of any act, inconsistent with the provisions of this act, be and the same are hereby repealed."

It was held by Chancellor Green, in *Brown* v. *Brown, 1 McCart. 78,* that this act did not repeal, by implication, that clause in the first section of the act of 1846 which required a

five years' residence in order to give the court jurisdiction, but the court of appeals held the contrary.

By the revision of March 27th, 1874, the first clause of the revision of 1846 was re-enacted, with two changes—instead of the word "bill" in the first section the word "act" was inserted, and instead of the words "five years" the words "three years" were inserted.

By the act of March 7th, 1889 (*P. L. of 1889 p. 40*), the first section was amended by inserting the word "two" instead of the word "three" in the statement of the length of residence and desertion necessary to confer jurisdiction of the subject-matter.